**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM MENTER,<br><br>Plaintiff,<br><br>v.<br><br>OFFICER J. MOHAMMED, *et al.*,<br><br>Defendants. | Civil Action No. 22-6154 (GC) (RLS)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** is before the Court on a Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56 filed by Defendants Officer J. Mohammed, Officer Ronald Walls, Sergeant Mihalik, Officer Klein, and Officer J. Rosado. (ECF No. 53.) Plaintiff William Menter, through counsel, opposed the Motion (ECF No. 56), and Defendants filed a reply (ECF No. 57). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the Motion is **GRANTED in part** and **DENIED in part**.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On October 24, 2020, Plaintiff was an inmate at the New Jersey State Prison (NJSP). (ECF No. 53-2 ¶ 1; ECF No. 56-2 ¶ 1.) Plaintiff alleges that, at approximately 4:30 p.m., his cell door did not open with the other inmates' doors for the evening meal. (ECF No. 53-2 ¶ 2; ECF No. 56-2 ¶ 2.) The order in which the doors were opened was randomized. (ECF No. 53-2 ¶ 12; ECF No. 56-2 ¶ 12.) Plaintiff alerted an inmate runner (Roy Dove) to tell the booth officers that his cell door did not open. (ECF No. 53-2 ¶ 3; ECF No. 56-2 ¶ 3.) Dove spoke with Officer Klein, who was in the booth at the time. (ECF No. 53-2 ¶¶ 5-6; ECF No. 56-2 ¶¶ 5-6.) Plaintiff was unable to hear Dove's conservation with Officer Klein, but, during the conversation, Officer Klein acknowledged Plaintiff standing in the cell. (ECF No. 53-2 ¶ 6; ECF No. 56-2 ¶ 6; ECF No. 53-3 Ex. A at 94:9-12.) Dove informed Plaintiff that the two officers in the booth were aware that he was unable to exit the cell, but the door still did not open. (ECF No. 56-2 ¶¶ 3, 6; ECF No. 53-3 Ex. A at 90:10-14, 93:14-16.) Plaintiff was eventually let out of his cell and was served his evening meal. (ECF No. 53-2 ¶ 4; ECF No. 56-2 ¶ 4.) By that point in time, food was already being discarded under the assumption that all inmates had been served, and Plaintiff was the last person served. (ECF No. 53-2 ¶ 4; ECF No. 56-2 ¶ 4; ECF No. 53-3 Ex. A at 94:18-19, 95:11-21.)

Between 6:00 p.m. and 6:15 p.m. Officer Walls came out of the officers' station booth for the first time that day to take an inmate count. (ECF No. 53-2 ¶ 7; ECF No. 56-2 ¶ 7.)

---

[1] On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)). The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' filings submitted in accordance with Local Civil Rule 56.1. Defendants' Statement of Material Facts not in Dispute Pursuant to L. Civ. R. 56.1 is docketed at ECF No. 53-2. Plaintiff's Response to Defendant's Statement of Material Facts is at ECF No. 56-2. Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

Plaintiff was scheduled for phone time at 6:30 p.m. (ECF No. 53-2 ¶ 8; ECF No. 56-2 ¶ 8.) Inmates used a land-line phone with a telephone cord plugged into an outlet jack and that was passed from an inmate to the runner/officer through the food port or the cell door. (ECF No. 53-2 ¶¶ 9-10; ECF No. 56-2 ¶¶ 9-10.) According to Plaintiff's deposition testimony, phone time was assigned in half-hour increments, with Plaintiff entitled to use the phone from 6:30 p.m. to 7:00 p.m. (ECF No. 56-2 ¶ 8; ECF No. 53-3 Ex. A at 84:22-25.) Plaintiff could not recall a single instance where his or any other inmate's phone time was cut from thirty to fifteen minutes. (ECF No. 56-2 ¶ 6; ECF No. 53-3 Ex. A at 109:24-110:5.) No specific policy existed mandating when inmates should pass the phone to the individuals retrieving it through the food port or cell door. (ECF No. 53-2 ¶ 11; ECF No. 56-2 ¶ 11.)

At 6:30 p.m., Dove brought the phone to Plaintiff, and, according to Plaintiff, Dove told him that he was not getting his normally allotted thirty minutes. (ECF No. 53-2 ¶¶ 14-15; ECF No. 56-2 ¶¶ 14-15.) Plaintiff called his fiancé (Mary Gleaton). (ECF No. 53-2 ¶ 16; ECF No. 56-2 ¶ 16.) The parties provide contradictory accounts as to what occurred next.

According to Officer Walls's deposition testimony (ECF No. 53-3 Ex. C), when the allotted time was over (and it was the next inmate's turn to use the phone), Officer Klein opened Plaintiff's cell door from the booth to allow Plaintiff to hand the phone to Officer Walls. (ECF No. 53-2 ¶¶ 17-18; ECF No. 53-3 Ex. C at 23:20-24:24.) Officer Walls ordered Plaintiff (who was at the cell door) to hand over the phone as someone else had to use it, but Plaintiff refused to comply with Officer Walls's orders. (ECF No. 53-2 ¶¶ 18-23; ECF No. 53-3 Ex. C at 12:23-14:7, 24:21-24, 25:1-3.)

Officer Walls testified that, instead of handing over the phone, Plaintiff "'became upset and irate' and 'started becoming very aggressive and he balled his fists up and lunged' at Officer

Walls." (ECF No. 53-2 ¶ 24 (quoting ECF No. 53-3 Ex. C at 14:8-11).) Perceiving an immediate threat, Officer Walls deployed his department-issued OC (oleoresin capsicum or pepper) spray and then ordered Plaintiff to get on the ground. (ECF No. 53-2 ¶¶ 25-26; ECF No. 53-3 Ex. C at 16:10-11, 32:6-9, 32:20-22.) However, Plaintiff became even more irate, yelling and cursing in the cell, Officer Klein called in a Code 33 from the booth, and Plaintiff refused to comply with multiple commands to get on the ground. (ECF No. 53-2 ¶¶ 28-29, ECF No. 53-3 Ex. C at 16:21-17:1, 31:24-32:2, 33:1-2.) A response team answered the Code 33. (ECF No. 53-2 ¶ 31; ECF No. 53-3, Ex. C at 17:16.)

In a Special Custody Report (ECF No. 53-3 Ex. E), Officer Rosado reported that, upon responding to the Code 33, he saw Plaintiff had assumed an aggressive fighting stance and was arguing with housing unit officers and refusing multiple commands to get to the ground. (ECF No. 53-2 ¶¶ 36-37; ECF No. 56-2 ¶¶ 36-37.) Because of his non-compliance, Defendants attempted to take Plaintiff to the ground to restrain and handcuff him in a safe manner. (ECF No. 53-2 ¶ 38; ECF No. 56-2 ¶ 38.)

Officer Mohammed testified at his deposition (ECF No. 53-3 Ex. B) that he lacked any independent recollection of the incident beyond what was contained in his contemporaneous reports. (ECF No. 53-2 ¶ 33; ECF No. 56-2 ¶ 33.) In his Special Custody Report (ECF No. 53-3 Ex. F), Officer Mohammed stated that, upon responding to the Code 33, he observed Plaintiff covered in OC spray and clenching his fists and yelling at the unit officer. (ECF No. 53-2 ¶ 40; ECF No. 56-2 ¶ 40.) According to both Officer Mohammed and Officer Walls, after Plaintiff refused orders to get down to the ground, Officer Mohammed attempted to take him to the ground to handcuff him, but Plaintiff began throwing punches, striking Officer Mohammed multiple times on his body, and making it difficult to control Plaintiff's hands. (ECF No. 53-2 ¶¶ 42-43; ECF

No. 56-2 ¶¶ 42-43; ECF No. 53-3 Ex. C at 38:13-20.) Officers Mohammed and Walls used controlled counterstrikes to gain compliance and finally take Plaintiff to the ground (specifically Officer Walls struck Plaintiff on the head and body to secure Plaintiff's hands behind his back to handcuff him). (ECF No. 53-2 ¶¶ 44-45; ECF No. 56-2 ¶¶ 44-45; ECF No. 53-3 Ex. C at 38:18-20, 39:4-7, 51:14-18.) Officer Mohammed reported that the officers' use of force then stopped, and he assisted in securing Plaintiff in handcuffs and leg irons. (ECF No. 53-2 ¶ 46; ECF No. 56-2 ¶ 46.)

Sergeant Mihalik testified (ECF No. 53-3 Ex. D) that she was doing her tour when the Code 33 was called. (ECF No. 53-2 ¶ 48; ECF No. 53-3 Ex. D at 13:19-20.) Officer Klein (who was in the booth) opened the door to allow the sergeant into Plaintiff's unit, and, by the time she responded to Plaintiff's location on the third floor, Officers Walls and Mohammed were already inside Plaintiff's cell and Plaintiff was in handcuffs. (ECF No. 53-2 ¶¶ 49-50; ECF No. 53-3 Ex. D at 13:22-14:2, 17:21-18:3, 21:15-18.) Sergeant Mihalik did not observe any blood on Plaintiff when she arrived. (ECF No. 53-2 ¶ 51; ECF No. 53-3 Ex. D at 21:23-24.) It is undisputed that Officer Walls and Officers Mohammed were removed from the unit (Officer Walls because he was injured, and Officer Mohammed pursuant to protocol), and a Code 53 was called to address Plaintiff's injuries. (ECF No. 53-2 ¶¶ 52-54; ECF No. 56-2 ¶¶ 52-54.)

According to Sergeant Mihalik, Plaintiff was placed in a chair outside of his cell so that he could be seen by the medical team. (ECF No. 53-2 ¶ 55; ECF No. 53-3 Ex. D at 20:13-17.) Because Plaintiff was yelling and screaming, the officers placed a spit hood on him. (ECF No. 53-2 ¶ 56; ECF No. 53-3 at 22:5-7.) Plaintiff did not complain about any pain or injuries while he was sitting in the chair, although blood was visible on his shirt and spit hood (Sergeant Mihalik did not see any blood on his face before the placement of the hood). (ECF No. 53-2 ¶¶ 57-59;

ECF No. 53-3 Ex. D at 23:9-13, 23:24, 24:5-6.)

Sergeant Mihalik testified that medical staff arrived to assess Plaintiff, who was uncooperative. (ECF No. 53-2 ¶ 60; ECF No. 53-3 Ex. D at 24:11-14.) Because of the lack of cooperation, Plaintiff was escorted to the medical clinic (located in another part of NJSP). (ECF No. 53-2 ¶ 61; ECF No. 53-3 Ex. D at 24:14-16.) Plaintiff was placed in a wheelchair, but the wheelchair could not be moved because he refused to put his feet up in the holders. (ECF No. 53-2 ¶ 62; ECF No. 53-3 Ex. D at 25:8-11.) Staff made several attempts to get Plaintiff to walk on his own, but he refused to comply. (ECF No. ¶ 63; ECF No. 53-3 Ex. D at 25:12-15.) Staff had to carry Plaintiff until they got to the ground floor (the clinic's location). (ECF No. ¶ 63; ECF No. 53-3 Ex. D at 25:12-15.) At one point, Plaintiff did walk a few steps in a hallway, but he kept saying he was not going anywhere and then stopped walking. (ECF No. ¶ 64; ECF No. 53-3 Ex. D at 27:17-21.) Furthermore, "Plaintiff began to state that 'something hurts, my foot hurts, my leg hurts, I can't walk.'" (ECF No. 53-2 ¶ 65 (quoting ECF No. 53-3 Ex. D at 26:8-10).) Once he reached the ground floor, Plaintiff began cooperating and pushing his wheelchair to the clinic. (ECF No. 53-2 ¶ 66; ECF No. 53-3 Ex. D at 25:16-17.)

At the clinic, Plaintiff refused medical attention, failed to cooperate, and was screaming and yelling. (ECF No. 53-2 ¶ 68; ECF No. 53-3 Ex. D at 29:9-13.)

The Special Investigations Division ("SID") investigated the incident and issued a report (ECF No. 53-3 Ex. G) on March 17, 2021.[2] (ECF 53-2 ¶ 70; ECF No. 56-2 ¶ 70.) The SID concluded that Plaintiff's allegations were unsubstantiated. (ECF No. 53-2 ¶ 70; ECF No. 56-2 ¶

[2] In Exhibit G, Defendants provide only the first page of the twenty-page SID report. (*See* ECF No. 53-3 Ex. G at 1.) The parties generally do not dispute the report's contents, and the Court accordingly relies on their respective summaries of the document. However, the Court notes that Defendants, as the moving party, has the burden to present a properly supported motion for summary judgment. *See Collins v. Monmouth Cnty. Corr. Inst.*, No. 21-2034, 2025 WL 1752372, at *5 (D.N.J. June 25, 2026).

70.) Plaintiff's phone logs showed that, on October 24, 2020, he made twelve phone calls, six of which were picked up by the party he dialed, totaling one hour and twenty-three minutes. (ECF No. 53-2 ¶ 72; ECF No. 56-2 ¶ 72.) The SID concluded that, because inmates were allotted two fifteen-minute phone calls per day, Plaintiff's claims that he was deprived of his phone privileges were unfounded. (ECF No. 53-2 ¶ 73; ECF No. 56-2 ¶ 73.) The investigators also reviewed video footage of Plaintiff's escort, which, according to them, showed that Plaintiff was agitated and uncooperative with custody and medical staff. (ECF No. 53-2 ¶¶ 74-75; ECF No. 56-2 ¶¶ 74-75.) Finally, according to its report, the SID "revealed multiple inmate witnesses who provided statements to investigators that Plaintiff was using aggressive and vulgar language and that Plaintiff initiated a fight with the officers." (ECF No. 53-2 ¶ 76 (citing ECF No. 53-2 Ex. G at 9-12).)

On January 29, 2025, "Defendants' expert, Dr. Richard Celeste," issued a report (ECF No. 53-3 Ex. H) regarding the October 24, 2020 incident, concluding, *inter alia,* that Defendants' conduct was consistent with the New Jersey Attorney General's Guidelines ("Guidelines"), other policies and training, and did not constitute excessive force or an objectively unreasonable use of force. (*See* ECF No. 53-2 ¶¶ 78-102.) Furthermore, according to Dr. Celeste's report, Plaintiff's injuries from the incident consisted of a laceration, facial swelling, and bruising; Plaintiff refused to have the laceration closed on October 24, 2020; he refused a medical assessment and denied needing care; he permitted medical staff to close the laceration with a liquid bandage on the evening of October 25, 2020; and, on October 26, 2020, Plaintiff stated he was fine and refused a vital sign check. (*See* ECF No. 53-2 ¶¶ 92-96; ECF No. 53-2 Ex. H at 45, 46.)

At his deposition (ECF No. 53-3 Ex. A), Plaintiff provided his account of what happened on October 24, 2020. According to Plaintiff, during the first five minutes of his conversation with

his fiancé, Plaintiff saw Officer Walls speaking with Sergeant Mihalik in the officers' station booth. (*Id.* at 112:20-24.) Officer Walls approached his cell, "shouting 'now run your F'n mouth,' for the purpose of assaulting him." (ECF No. 56-2 ¶ 18 (quoting ECF No. 53-3 Ex. A at 113:1-14).) Officer Walls pulled the phone cord out of the wall, Plaintiff surrendered the phone to Officer Walls, and the Officer responded by pushing the phone back into the cell through the food port opening. (ECF No. 56-2 ¶ 20; ECF No. 53-3 Ex. A at 114:1-3, 115:20-24.) Sergeant Mihalik yelled to Officer Klein (in the booth) to open Plaintiff's cell and repeated the order because Officer Klein did not "catch the command." (ECF No. 53-3 Ex. A at 117:5.)

When the cell door was opened, Officer Walls lunged into the cell and sprayed OC spray in Plaintiff's face while Plaintiff was unarmed and offering no resistance (and in fact was attempting to surrender) and officers were gathering outside of the cell. (ECF No. 56-2 ¶ 22; ECF No. 53-3 Ex. A at 116:7-117:8.) Plaintiff testified that the spray "will make you choke. It will make you cough. It will cause a burning and irritation to your eyes. It will cause you to tear." (ECF No. 56-2 ¶ 22 (quoting ECF No. 53-3 Ex. A at 117:18-20); *see also id.* (noting that the use of OC spray is governed by the Guidelines and may be used only during "anything beyond routine and procedural such as a combative situation" (quoting ECF No. 53-3 Ex. B at 31:13-32:4)).)

After Walls sprayed OC in Plaintiff's face, "[Plaintiff] heard Sgt. Mehalik say 'go ahead, hurry up,' and then Officers Mohammed and Rosado rushed into the cell, picked Plaintiff up off the ground, slammed him back down onto his face and torso, and proceeded to 'relentlessly' beat and stomp Plaintiff in his head, chest, stomach, and legs at least until he lost consciousness." (ECF No. 56-2 ¶ 26 (quoting ECF No. 53-3 Ex. A at 122:1-123:3); *see also id.* (noting that Officer Walls injured his hand).)

Plaintiff regained consciousness while the assault was continuing, lost consciousness

again, and then regained consciousness for a second time, found himself laying in a pool of blood and in restraints, at which time he heard the Code 33 announced. (ECF No. 56-2 ¶ 29; ECF No. 53-3 Ex. A at 123:6-20.) Plaintiff appears to deny that a team responded to the Code 33, claiming that a response team arrived to provide medical attention on a Code 53 medical emergency (which was called approximately two minutes after the Code 33). (ECF No. 56-2 ¶ 31; ECF No. 53-3 Ex. A at 124:10-13.)

"Plaintiff, while still in the cell was ordered to stand but he could not bear weight on his [right] leg. So [he] was dragged out of the cell into the middle of the floor of the unit." (ECF No. 56-2 ¶ 55 (citing ECF No. 53-3 Ex. A 125:3-126:2).) "A wheelchair was brought to where Plaintiff was, but Mihalik declared that he was faking and could walk on his own. He was then held up and dragged to a wheelchair, where a spit mask was thrown over his face despite not spitting on anyone." (*Id.* (citing ECF No. 53-3 Ex. A 125:3-126:2).) According to Plaintiff, the facemask was used to obscure his grievous injuries; he had lacerations near his eyes that should have been treated with stiches; he was taken to the clinic rather than the infirmary because of his serious injuries; he did not refuse to put his feet up on the wheelchair holders; he was not "non-compliant;" he was unable to walk; he did not push his wheelchair (instead, he was pushed by corrections staff); and he was yelling that he was assaulted while in the clinic. (ECF No. 56-2 ¶¶ 56-58, 61-64, 68; ECF No 53-3 Ex. A at 128:1-6, 128:8-10; ECF No. 53-3 Ex. D at 25:16-17.)

With respect to the SID report, Plaintiff notes that one inmate (named Alford) stated that Plaintiff "can't fight back [because t]here is like 90 fucken police jumping him" and that the report acknowledged the phone policy is subject to officer discretion. (ECF No. 56-2 ¶¶ 73, 76 (quoting ECF No. 53-3 Ex. G at 9-12).)

On October 19, 2022, Plaintiff, through counsel, filed his Complaint, asserting four counts

or claims against Defendants: (1) Count I: 42 U.S.C. § 1983 (Excessive Force); (2) Count II: 42 U.S.C. § 1983 (Conspiracy); (3) Count III: New Jersey Civil Rights Act (N.J.S.A. § 10:6-2); and (4) Count IV: Assault & Battery (New Jersey State Law). (ECF No. 1 ¶¶ 41-62.) Plaintiff seeks compensatory and punitive damages and an award of reasonable attorney's fees under 42 U.S.C. § 1988. (*Id.* at 8.)

Defendants moved for summary judgment on February 2, 2026, and the Motion is now ripe for review. (ECF No. 53.)

## II. STANDARDS OF REVIEW

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014)); *see also* Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation omitted). The moving party may also meet this burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (citation omitted). "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *Id.* at 250-51 (citing *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949)). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Nonetheless, summary judgment "cannot be avoided by resorting to speculation, or statements of personal opinion or mere belief; indeed, 'inference based on speculation or conjecture does not create a material factual dispute.'" *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 527 (D.N.J. 2013) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990), *aff'd*, 649 F. App'x 239 (3d Cir. 2016)); *see also Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (noting that a party opposing summary judgment must rely on facts, not opinions or conclusions); *Rakowski v. Brigantine*, Civ. No. 19-21847, 2022 WL 326992, at *1 (D.N.J. Feb. 3, 2022) ("[M]ere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (citing *Orsatti v. N.J. State Pol.*, 71 F.3d 480, 484 (3d Cir. 1995)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III. DISCUSSION

### A. Count I: 42 U.S.C. § 1983 (Excessive Force)

In Count I, Plaintiff alleges an excessive force claim under § 1983.[3] (ECF No. 1 ¶¶ 41-47.) The Eighth Amendment protects convicted prisoners from any force applied "maliciously and sadistically for the very purpose of causing harm." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 (3d Cir. 2021) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).

An Eighth Amendment excessive force claim has both an objective and a subjective component. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). To be liable under the Eighth Amendment, the defendant must act with a "sufficiently culpable state of mind," and the conduct must be objectively harmful enough to violate the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). When evaluating excessive force claims, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018). In conducting this inquiry, courts examine a number of factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of a forceful response. *See Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (citing *Whitley*, 475 U.S. at 321). "The objective component of the excessive force inquiry is met when 'the inmate's injury was more than de minimis.'" *Ricks*, 891 F.3d at 480 (quoting *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000)).

---

3 "To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or the laws of the United States committed by a person acting under the color of state law." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003) (citation omitted).

Defendants argue that Count I fails as a matter of law because Plaintiff cannot satisfy the objective and subjective components required to prove a violation of the Eighth Amendment. (ECF No. 53-1 at 7-14.) According to Defendants, Plaintiff cannot meet the subjective requirement because he has not pled or produced evidence that could establish that Defendants possessed a culpable state of mind when they used force against him on October 24, 2020. (*Id.* at 9.) Defendants assert that, by Plaintiff's own admission, Officer Klein and Sergeant Mihalik did not enter the cell at all (and accordingly could not have used excessive force), Officer Klein was stationed at the control booth, and Sergeant Mihalik did not arrive at Plaintiff's cell until Plaintiff had already been secured in handcuffs. (*Id.*) Furthermore, Defendants argue that Plaintiff's deposition testimony is "devoid of any testimony establishing Defendants acted with the intent to cause harm beyond his own complaints, which are uncorroborated by any evidence of record." (*Id.* (citing ECF No. 53-3 Ex. A).) Relying on Defendants' deposition testimony and reports, the SID report, and Dr. Celeste's report, Defendants contend that the summary judgment record overwhelmingly establishes that the incident occurred because Plaintiff disobeyed multiple lawful orders, aggressively lunged at Officer Walls, and struck Officer Mohammed, requiring the measured use of force for self-defense and to restore order, subdue, and handcuff a non-compliant and physically aggressive inmate. (*Id.* at 11-12.) Likewise, Defendants argue that this evidence establishes that Defendants cannot meet the objective component, *e.g.*, the record demonstrates that the force was necessary because of Plaintiff's aggressive and threatening behavior and his subsequent attempted assault of Officer Walls and actual assault of Officer Muhammed; Plaintiff's injuries consisted only of a facial laceration, bruising, and swelling (for which Plaintiff refused medical care); and Defendants stopped using physical force once Plaintiff was placed in handcuffs. (*Id.* at 12-14.)

Relying primarily on the description of the incident Plaintiff provided at his deposition, Plaintiff asserts that he was the victim of "the unprovoked, pre-meditated, and gratuitously beating" of Plaintiff "by Defendants Walls[,] Mohammed, and Rosado, and facilitated by Defendants Mihalik and Klein," leaving Plaintiff "unconscious in his cell in a pool of his own blood." (ECF No. 56-3 at 1.) Plaintiff contends that the Court should reject Defendants' "overzealous, skewed, and improper view that, at summary judgment, the Court should accept their version of the facts and disregard Plaintiff's [account]" and characterizes their Motion as really "a trial brief." (*Id.* at 1, 5.) Pursuant to Federal Rule of Civil Procedure 11, Plaintiff requests "a warning that a motion such as this would warrant sanctions in the future." (*Id.* at 17.)

In their reply, Defendants assert that Plaintiff's Rule 11 argument is a red herring from Plaintiff's failure to raise a genuine dispute of material fact or provide any other proper basis for denying a routine and well-supported motion for summary judgment. (ECF No. 57 at 2.) Defendants purportedly rely on the "well-established principle that a party's self-serving or conclusory testimony must be evaluated in the context of the record as a whole" and assert that, under this standard, Plaintiff's deposition testimony, when measured against the record and governing legal standards, does not create a genuine issue of material fact. (*Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).) According to Defendants, summary judgment motions are routinely made and adjudicated in civil rights cases, including those involving allegations of excessive force (and conspiracy). (*Id.* at 3.) Purportedly, Plaintiff's position that the mere existence of contrary deposition testimony precludes summary judgment effectively renders summary judgment categorically unavailable and is inconsistent with controlling Third Circuit precedent. (*Id.*) Defendants contend that case law holds that a plaintiff may not defeat a summary judgment motion by relying solely on conclusory, self-serving affidavits or deposition testimony

and that the relevant inquiry is not whether Plaintiff is relying solely on his own testimony to defeat the motion but whether that testimony, when viewed in the context of the record as a whole, is sufficient for a reasonably jury to credit it. (*Id.* (first citing *Johnson v. Metlife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012); then citing *Gonalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 3d Cir. 2012); and then citing *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011)).

Claiming that Plaintiff "is doing the very thing he is accusing Defendants of—relying on his deposition testimony while ignoring the overwhelming evidence that establishes that there are no issues of material fact in this case," Defendants indicate that Plaintiff's fact section in his opposition brief is factually inaccurate and insufficient to defeat the Motion because it is contradicted by the deposition testimony of three Defendants, the SID investigation, and especially the statements made by multiple inmates to the SID who witnessed the incident and told the investigators that Plaintiff was using aggressive and vulgar language and that Plaintiff initiated the fight with the officers. (*Id.* at 4.) According to Defendants, "Plaintiff's account of his cell door being opened prior to dinner" omits the fact that he did receive a meal and the cell doors were opened in a randomized fashion as well as Plaintiff's testimony that he was unable to hear Dove's conversation with Officer Klien. (*Id.* (citation omitted).) Defendants similarly contend that Plaintiff's inability to recall a single instance where an inmate's phone time was cut from thirty to fifteen minutes is irrelevant because the policy allotted inmates two fifteen-minute phone calls per day and Plaintiff had already exceeded that limit. (*Id.* at 4-5.) According to Defendants, "Plaintiff has provided nothing to support his contention that Officer Walls' actions were done 'for the purpose of assaulting him' other than his own speculation," and does not mention (as recounted in Officer Walls's deposition testimony) his multiple refusals to comply with Officer Walls's orders

or the fact that he became upset and lunged at Officer Walls. (*Id.* at 5.) With respect to the SID report, Defendants also contends that Plaintiff miscites the report (which never stated that he was beaten relentlessly), the inmate stated, "[y]eah, *some dude just punch [sic] the police in the face* and now is like ninety of them," another inmate said that Plaintiff "popped on the police" and argued with the police, telling the officers to "come out of the m***** f*****, come out the booth," and the SID's review of the video footage of the escort showed the inmate was agitated and uncooperative with staff. (*Id.* at 5-6 (quoting ECF No. 53-3 Ex. G at 9, 12) (emphasis added) (other alterations in original); *see also id.* at 6 (asserting that Plaintiff fails to mention Sergeant Mihalik's testimony regarding his lack of cooperation and refusal of medical attention).)

The Court concludes that, considering the record as a whole and in the light most favorable to Plaintiff, and making reasonable inferences in his favor, there are genuine issues of material fact regarding the subjective and objective prongs of a claim for excessive force.

Plaintiff testified under oath that Officer Walls approached his cell, "shouting 'now run your F'n mouth.'"[4] (ECF No. 53-3 Ex. A at 113:1-5.) After Officer Walls pulled the phone cord out of the wall, Plaintiff surrendered the phone through the food port, and Officer Walls then pushed the phone back into the cell. (*Id.* at 114:1-3, 115:20-24.) After the cell door was opened from the booth (by Officer Klein, who was ordered to open the door by Sergeant Mihalik), Officer

---

[4] Plaintiff previously asked Officer Walls why his cell door did not open with the other inmates' doors during mealtime, and Officer Walls responded that "he is not there to answer any F'n questions from inmates." (ECF No. 53-3 Ex. A at 101:14-24.) Furthermore, while he was speaking on the phone (and before Officer Walls approached his cell), Plaintiff observed Officer Walls in the booth talking to the officers in the booth, including Sergeant Mihalik. (*Id.* at 112:20-24.) As Officer Walls approached and made his comment about "running your F'n mouth," Plaintiff told his fiancé that other officers were gathering in the sallyport (the entrance to the block) and that he believed he was about to be assaulted. (*Id.* at 113:1-114:3.) According to the SID report, Plaintiff told his fiancé that he believed he was about to be assaulted. (ECF No. 56-3 at 2 (citing ECF No. 53-3 Ex. G at 9).)

Walls lunged into the cell and sprayed OC spray in Plaintiff's face, although Plaintiff was unarmed, not resisting, and trying to surrender. (*Id.* at 116:7-117:8.) Plaintiff testified that the spray "will make you choke. It will make you cough. It will cause a burning and irritation to your eyes. It will cause you to tear." (*Id.* at 117:18-20.) After Walls sprayed OC in Plaintiff's face, Sergeant Mihalik (who was standing by the cell door) said "go ahead, hurry up," and Officers Mohammed and Rosado rushed into the cell (with Walls coming into the cell behind them), picked Plaintiff up off the ground, slammed him back down onto his face and torso, and proceeded to "relentlessly" beat and stomp Plaintiff in his head, chest, stomach, and legs. (*Id.* at 122:1-123:3.) During this assault, Plaintiff lost consciousness twice, and, when he finally woke up, he saw he was laying in a pool of blood and had been placed in restraints. (*Id.* at 123:6-20.) Subsequently, Plaintiff, who was unable to walk and had lacerations near his eyes, was dragged out of the cell and placed in a wheelchair to be taken to the medical clinic for treatment, and a spit mask was put on his face even though he was not spitting on anyone.[5] (*Id.* at 125:3-126:2, 128:1-6, 128:8-10.)

As this Court has already noted, *see supra* Section II, "[i]n considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino*, 358 F.3d at 247 (quoting *Anderson*, 477 U.S. at 255). In fact, "this caution [against making credibility determinations and weighing the evidence] has particular force when it comes to sworn testimony, which is not to be taken lightly." *Nunez v. Heere*, 438 F. Supp. 3d 321, 324 (E.D. Pa. 2020). "In many cases, testimony forms the bulk of the evidence. A witness' oath to testify truthfully, which attaches the penalty of perjury, must be accorded substantial weight. The administration of justice in civil and criminal

[5] According to Plaintiff, he subsequently underwent surgery for an ACL meniscus tear that was caused by this incident. (ECF No. 53-3 at 134:12-13, 23-25.)

cases alike depends on sworn testimony." *Id.*

In *Johnson*, the court explained that "the issue is not whether Plaintiff has relied solely on his own testimony, but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature." *Johnson*, 883 F. Supp. 2d at 549 (citing *Gonzalez*, 678 F.3d at 263). "Under the summary judgment standard, which is designed to identify, not resolve, issues of fact, such testimony should be set aside only under extreme circumstances [such as where the testimony conflicted with the same witness's earlier testimony and other record evidence]." *Walker v. City of Newark*, No. 19-16853, 2023 WL 3478465, at *6 (D.N.J. May 16, 2023) (citing *Irving*, 439 F. App'x at 127). The *Johnson* court, "conclude[ed] that a rational trier could credit Plaintiff's self-serving testimony, even in light of Defendants' evidence." *Johnson*, 883 F. Supp. 2d at 549.

Like Johnson's deposition testimony, "Plaintiff's deposition is not a conclusory, self-prepared affidavit, but rather testimony elicited from questions by opposing counsel which challenged Plaintiff's recollection of events." *Id.* In response to counsel's questioning, Plaintiff provides a detailed sworn description of an incident in which, according to Plaintiff, he was the non-resisting victim of an unprovoked assault by several officers, which resulted in injuries including the inability to walk and facial lacerations requiring him to be taken to the medical clinic for treatment. *See Walker*, 2023 WL 3478465, at *6 (concluding, with respect to excessive force claim against police officers, that a reasonable jury could credit the plaintiff's deposition testimony identifying two police officers "as the people he actually saw" although the plaintiff never met the individuals prior to the incident); *Mayhue v. Schack*, No. 16-0705, 2023 WL 2625271, at *5 (D.N.J. Mar. 24, 2023) (noting that a single non-conclusory affidavit or witness testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary

judgment and concluding that "Plaintiff's version of events, set forth in sworn deposition testimony and a declaration, contradicts Defendants' version and creates questions of fact regarding [whether the force used was reasonable]" (citations omitted)).

Furthermore, while they may have presented more evidence in support of their contradictory account of the incident, Defendants likewise rely on self-serving testimony and statements, *i.e.*, the deposition testimony of Officer Walls and Sergeant Mihalik and the Special Custody Report prepared by Officer Muhammed (who testified at his subsequent deposition that he had no independent recollection of the incident beyond what was contained in his reports). (*See generally* ECF No. 53-2.) Like Plaintiff, the named Defendants have an interest in the outcome of this Motion and Plaintiff's lawsuit against them. "Indeed, the testimony of a litigant will almost always be self serving since few litigants will knowingly volunteer statements that are prejudicial to their case. However that has never meant that a litigant's evidence must be categorically rejected by the fact finder." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 321 n.2 (3d Cir. 2014).

Dr. Celeste (and apparently the SID) adopted Defendants' factually disputed account of the incident; based on the parties' submissions, the inmate statements to the SID were evidently unsworn and conclusory (and only one inmate has been identified by the parties); and even if Plaintiff had exceeded his allotted phone time, Plaintiff testified under oath that he surrendered the phone to Officer Walls through the food port, who responded by pushing the phone back into the cell through the food port and (after the door was opened) lunging into the cell and spraying OC in Plaintiff's face. (*See* ECF No. 53-3 Ex. A at 114:1-3, 115:20-24, 116:7-117:8; ECF No. 53-3 Ex. H at 40-50.)

With respect to the SID report's evaluation of the video footage of the escort, the Supreme Court has explained that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. In *Scott*, the record included an undisputedly authentic and undoctored videotape record accurately depicting the events in question, and it clearly contradicted the version of the story told by the plaintiff. *Id.* at 378. Accordingly, the plaintiff's "version of events [in *Scott*] is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380 ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

Because Defendants do not submit the escort video footage (and Plaintiff denies SID's assessment of the footage as "inadmissible hearsay, opinion testimony, and violative of [Federal Rule of Evidence 1002 ('Requirement of the Original')]" (ECF No. 56-2 ¶ 75)), the Court is unable to assess whether the footage so blatantly contradicts Plaintiff's sworn testimony regarding what happened when he was escorted to the clinic. *See Collins v. Monmouth Cnty. Corr. Instit.*, No. 21-2034, 2024 WL 4563908, at *7 (D.N.J. Oct. 24, 2024) (denying without prejudice the defendants' motion for summary judgment on a pretrial detainee's excessive force claim because, *inter alia*, "the Court is not free to ignore Plaintiff's deposition testimony or weigh the evidence" and "[the d]efendants have not provided the Court with a working copy of the video footage on which they rely"), *recons. denied*, 2025 WL 1752372, at *5 ("As the moving parties, [the d]efendants had to present a properly supported motion for summary judgment demonstrating the lack of a genuine dispute as to any material fact and that the movants are entitled to judgment as a matter of law." (citations omitted)). In addition, there is no indication that video footage exists of the assault itself.

Accordingly, Defendants fail to present unambiguous video footage, or other similar definitive evidence, clearly contradicting Plaintiff's sworn account of the assault. *See Patterson v. City of Wildwood*, 354 F. App'x 695, 698 (3d Cir. 2009) ("We agree, further, that crediting the testimony of the club's bouncer, and concluding that it contradicts Patterson's version in such a way as to alter the [summary judgment] standard [requiring the court to take the facts in the light most favorable to the non-moving party and make all reasonable inferences to him] and preclude Patterson from proceeding to trial [on his excessive force claim against the arresting officer], was improper.").

In addition, Plaintiff's deposition testimony is bolstered by additional evidence in the record. For instance, it is undisputed that, in the recording of Plaintiff's phone call, prior to the incident, Plaintiff believed he was about to be assaulted, "he" was about to pull the phone plug and "here they come now." (*See* ECF No. 56-3 at 3, 5 (quoting ECF No. 53-3 Ex. G at 5, 9); *see also id.* at 4-6 (noting that Plaintiff's current account is consistent with the interview he gave three days after he was attacked)). Additionally, Officer Mohammed had no independent recollection of the incident at his deposition (and accordingly he did not remember being struck by Plaintiff), and Officer Rosado did not mention Officer Mohammed being struck in his statement to the SID. (*Id.* at 4 (citing ECF No. 53-3 Ex. B at 20:23-21:2; ECF No. 53-3 Ex. G at 3).)

In conclusion, given the record as a whole viewed in the light most favorable to Plaintiff (and drawing all reasonable inferences in his favor), a reasonable finder of fact could conclude that Plaintiff's version of the facts is credible and that force was applied not in a good-faith effort to maintain or restore discipline, but to maliciously cause harm. *Hudson*, 503 U.S. at 7; *Ricks*, 891 F.3d at 480. The Motion is denied as to Count I.[6]

---

[6] Although the Court agrees with Plaintiff that Defendants' Motion should be denied under the applicable summary judgment standards with respect to Count I (as well Counts II and III), at

**B. Count II: 42 U.S.C. § 1983 (Conspiracy)**

In Count II, Plaintiff alleges a conspiracy claim under § 1983. (ECF No. 1 ¶¶ 48-52.)

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)). The elements of a § 1983 conspiracy are: (1) two or more persons conspire to deprive a person of constitutional rights; (2) one or more of the conspirators perform any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States. *See id.* at 294 n.15 (further noting that conspirators must act under the color of state law).

An underlying § 1983 violation constitutes a prerequisite for a conspiracy claim. *See Holt Cargo Sys., Inc. v. Del. River Port Auth.*, 20 F. Supp. 2d 803, 843 (E.D. Pa. 1998), *aff'd*, 165 F.3d 242 (3d Cir. 1999). In addition, "the rule is clear" that the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009) (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)). To show agreement, the plaintiff must demonstrate that "the state actors named as defendants in the[ ] complaint somehow reached an understanding to deny [the plaintiff] his rights." *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993) (alterations added) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)). However, "an allegation of conspiracy can only be overcome at summary judgment when the moving parties' submissions foreclose[ ] the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that there had been a meeting of the minds." *Jutrowski*, 904

---

this time, it denies Plaintiff's request for "a warning that a motion such as this would warrant sanctions in the future" (ECF No. 56-3 at 17).

F.3d at 295 (quoting *Anderson*, 477 U.S. at 249). "Such circumstantial evidence may include that the alleged conspirators 'did or said something . . . to create an understanding,' 'the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy.'" *Id.* (quoting *Great W. Mining & Mineral Corp. v. Fox Rothschild LLP*, 615 F.3d 159, 161 (3d Cir. 2010)). "[I]nferring mental state from circumstantial evidence is among the chief tasks of factfinders." *Id.* (quoting *Kedra v. Schroeter*, 876 F.3d 424, 444 (3d Cir. 2017)).

Defendants assert that Plaintiff fails to establish an underlying constitutional violation because the evidence "clearly demonstrates that Defendants' actions were made purely in measured response to Plaintiff's own behavior as set forth in detail in Point I [Defendants' discussion of the excessive force claim]." (ECF No. 53-1 at 15.) Defendants similarly contend that Plaintiff presents no evidence of the existence of a conspiracy except for his own unsupported allegations. (*See* ECF No. 57 at 7-9.)

However, the Court has determined that a reasonable jury could find in Plaintiff's favor on his § 1983 Eighth Amendment excessive force claim in Count I. *See supra* Section III.A. For substantially the same reasons the Court concludes that the record (viewed in the light most favorable to the Plaintiff and drawing all reasonable inferences in his favor) raises genuine issues of material fact regarding whether Defendants conspired to subject Plaintiff to the use of excessive force. For example, according to Plaintiff's sworn account, Plaintiff observed Officer Walls speaking with Sergeant Mihalik in the booth; Officer Walls exited the booth and approached Plaintiff, shouting "now Run your F'n mouth;" after Plaintiff surrendered the phone and Officer Walls responded by pushing the phone back into the cell, Sergeant Mihalik, who was standing outside the cell, called to Officer Klein (in the booth) to open Plaintiff's cell, the cell was opened,

and Officer Walls then sprayed Plaintiff with OC; after being sprayed; Sergeant Mehalik said "go ahead, hurry up," and Officers Mohammed and Rosado rushed into the cell and attacked Plaintiff. (ECF No. 53-3 Ex. A at 112:20-24, 113:1-14, 114:1-3, 115:20-24, 116:7-117:8, 117:17, 122:1-123:3.) Given the evidence, the Court denies summary judgment as to Count II.

**C. Qualified Immunity**

An award of qualified immunity protects a government official from suit for damages "insofar as [his or her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This inquiry is limited to the law at the time of the incident, as "an official could not reasonably be expected to anticipate subsequent legal developments." *Harlow*, 457 U.S. at 818. The court must determine whether: (1) the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 557 (3d Cir. 2017) ("We first determine whether a right has been violated. If it has, we then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful." (citation omitted)). Those two inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The defendant official is entitled to qualified immunity if either prong is not satisfied. *See id.* at 244-45.

Under the second prong, "the right must be defined beyond a high level of generality," *Thomas v. City of Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)), but there need not be "a case directly on point for a right to be clearly established,"

*id.* (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021)). For the right to be clearly established, however, "[then-]existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citations omitted); *see also Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19.

For qualified-immunity purposes, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (quoting *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017)); *see also Wesby*, 583 U.S. at 63 (stating that, to be clearly established, a legal principle must be dictated by controlling authority or a robust consensus of cases of persuasive authority). Courts "first look to factually analogous precedents of the Supreme Court and the Third Circuit." *See James v. N.J. State Pol.*, 957 F.3d 165, 170 (3d Cir. 2020) (citing *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247–48 (3d Cir. 2016)). Courts next examine persuasive authorities, such as non-precedential opinions within this circuit and decisions from other courts of appeals. *See id.* "If the scope of a particular constitutional right is 'highly fact-specific,' it can be reasonable for governmental officials to err in believing that their conduct comports with the law." *McCrimmon v. Johnson*, No. 18-16281, 2022 WL 17352193, at *6 (D.N.J. Nov. 30, 2022) (quoting *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 859 (3d Cir. 2012)).

"'[T]he party asserting the affirmative defense of qualified immunity' bears the burden of persuasion on both prongs at summary judgment." *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023) (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)). At the summary judgment stage,

the evidence must be viewed in the light most favorable to the plaintiff. *See id.* at 229-30. Accordingly, for purposes of the second prong of the defense, the right must be defined to reflect "'the specific context of the case,' as viewed in the light most favorable to the plaintiff." *Id.* at 230 (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165-66 (3d Cir. 2021)).

According to Defendants, they are entitled to qualified immunity with respect to Counts I and II because Plaintiff fails to show that their actions violated his federal constitutional rights. (ECF No. 53-1 at 18.) For the reasons stated in Sections III.A. and III.B., *supra*, Defendants are incorrect, and they thereby fail to establish that they are entitled to qualified immunity under the first prong of the standard.

As to the second prong, Defendants assert that, "even under Plaintiff's best-case scenario of facts, none of the rights alleged to have been violated were clearly established." (*Id.*) Defendants indicate that the right at issue against the use of force "where the use of force was utilized only to subdue and handcuff Plaintiff who was combative and where, as the evidence shows, Defendants' use of force stopped immediately once Plaintiff was restrained." (*Id.* at 20.) However, Defendants fail to define the right based on the facts viewed in the light most favorable to Plaintiff. *See Mack*, 63 F.4th at 227, 229-30. As the Court has already observed, *see supra* Section III.A., a reasonable finder of fact could conclude that an officer sprayed a non-resisting and compliant inmate in the face with OC spray, officers then picked up and slammed the inmate on the floor, beat, kicked, and stomped the inmate and continued to assault him even after he lost, regained, and lost consciousness again, left the inmate laying in a pool of blood and unable to walk (and requiring medical attention), and the officers were assisted and encouraged by another officer who opened the cell door allowing them to attack the inmate and a sergeant who said "go ahead, hurry up." It is undisputed that such circumstances would constitute a violation of clearly

established constitutional rights under the qualified immunity doctrine.

In fact, in their reply brief, while acknowledging that Plaintiff cites a "litany" of case law "wherein the plaintiffs were all either restrained and/or incapacitated while they were subjected to excessive force," Defendants reiterate their factually disputed characterization of this case as involving an aggressive and combative inmate who attempted to assault officers necessitating the use of mechanical and physical force that ceased once the inmate was handcuffed. (ECF No. 57 at 9-11.) Even if Defendants' factual scenario is correct, the Court cannot credit Defendants' factually contested account of the incident on a motion for summary judgment. Accordingly, Defendants are not entitled to summary judgment on qualified immunity grounds.

**D. Count III: New Jersey Civil Rights Act (N.J.S.A. § 10:6-2)**

In Count III, Plaintiff asserts claims under the NJCRA, N.J. Stat. Ann. § 10:6-2(c). (ECF No. 1 ¶¶ 53-57.) It is undisputed that the NJCRA is analogous to § 1983, and a plaintiff cannot maintain a claim under the state civil rights statute if the underlying federal civil rights claims fail. (*See* ECF No. 53-1 at 21.) Accordingly, for the same reasons that this Court denies summary judgment as to the federal civil rights claims in Counts I and II, *see supra* Sections III.A., III.B., and III.C., the Court denies the Motion as to Count III.

**E. Count IV: Assault & Battery (New Jersey State Law).**

In Count IV, Plaintiff alleges a New Jersey state law claim for assault and battery. (ECF No. 1 ¶¶ 58-62.) Defendants argue that this claim fails because it is undisputed that Plaintiff did not file the requisite notice of claim under the New Jersey Tort Claims Act ("NJTCA"). (*See* No. 53-1 at 21-22.) The Court agrees with Defendants.

The NJTCA is applicable to all common law tort claims against public entities and employees, *see Velez v. City of Jersey City*, 180 N.J. 284, 289-91 (N.J. 2005), and the statute

generally requires a notice of claim be filed within 90 days after the accrual of a cause of action, N.J. Stat. Ann § 59:8-8(a). Section 59:8-8(a) provides that a claimant "shall be forever barred from recovering against a public entity or public employee" if he or she fails to comply with this 90-day requirement "except as otherwise provided" in N.J. Stat. Ann. § 59:8-9. Under § 59:8-9, a claimant who fails to file a notice within 90 days may be permitted by a court to file such notice within one year of accrual provided that the entity or employee has not been substantially prejudiced thereby and the claimant shows sufficient reasons constituting extraordinary circumstances for failing to file a notice of claim within the 90-day period or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter. Once the one-year period has expired, the court lacks jurisdiction to extend the filing period. *See Iaconianni v. N.J. Turnpike Auth.*, N.J. Super. 294, 298 (App. Div. 1989).

It is undisputed that Plaintiff failed to file the notice of claim within 90 days of accrual and did not seek leave to file a late notice of claim within the requisite one-year period.

Plaintiff argues that Defendants waived their NJTCA "notice" defense because they failed to raise such a defense in their Answer. (ECF No. 56-3 at 12; *see also* ECF No. 11).) "The defense of failure to file notice under the Tort Claims Act is an affirmative one which must be pleaded in order to avoid surprise, and a defendant may be found to have waived the protection thereof by failing to plead it as a defense." *Hill v. Bd. of Educ.*, 183 N.J. Super. 36, 40 (App. Div. 1982) (citations omitted). However, a defendant is not absolutely barred from raising an affirmative defense after the filing of an answer. *See Monaco v. City of Camden*, No. 04-2406, 2008 WL 408423, at *6 n.1 (D.N.J. Feb. 13 2008) ("The Court recognizes that the Individual Defendants themselves were not especially diligent in raising this defense. However, '[a] defendant does not waive an affirmative defense if raised at a pragmatically sufficient time with no prejudice to the

plaintiff.'" (quoting *Klimowicz v. Unum Life Ins. Co. of America,* No. 04-2990, 2007 WL 2904195, at *6 (D.N.J. Sept. 28, 2007)); *McNeil v. Legislative Apportionment Comm'n*, 177 N.J. 264, 399 (2003) (stating that affirmative defenses have been permitted to be raised either *sua sponte* or untimely where the interests of justice or public policy were at stake). In *Hill*, the court did not permit the municipal defendants to raise their NJTCA defense because, *inter alia,* "if defendant had specifically pleaded lack of notice as a defense or acted promptly in bringing its motion for dismissal, plaintiffs would have had ample opportunity in which to apply to the trial judge for permission to file a late notice of claim since Kathleen Hill did not turn 19 years of age until February 14, 1979, 14 months after the complaint." *Hill,* 183 N.J. Super. at 42.

Plaintiff does not argue that Defendants' failure to raise the NJCRA defense in their Answer prejudiced Plaintiff. While the incident occurred on October 24, 2020, Plaintiff's counseled Complaint was filed on October 19, 2022, and Defendants answered the Complaint on May 8, 2023. Accordingly, unlike in *Hill*, by the time Plaintiff and Defendants filed their Complaint and Answer, respectively, the time to apply for permission to file a late notice of claim had expired.

Plaintiff further contends that he satisfies the doctrine of substantial compliance because, within a week of the assault, he raised the issue in writing that he had been assaulted by his jailers during the disciplinary process instituted against him, the SID investigated the matter, and Plaintiff was interviewed. (ECF No. 53-3 at 13 (citing ECF No. 56-5; ECF No. 53-3 Ex. G).) Nevertheless, as Plaintiff indicates, "[t]he doctrine of substantial compliance can apply to NJTCA notice in the limited circumstances where 'the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute,'" and, to trigger this substantial compliance doctrine, the claimant must show: "(1) the lack

of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim; and (5) a reasonable explanation why there was not strict compliance with the statute.'" (*Id.* (quoting *Panarello v. City of Vineland*, 160 F. Supp. 3d 734, 746 (D.N.J. 2016).) Plaintiff did not file a technically deficient notice, and he fails to provide any explanation why there was an absence of strict compliance with the statute.

Accordingly, the Court grants the Motion as to Count IV.

## IV. CONCLUSION

For the reason set forth above, and other good cause shown, the Defendants' Motion is **GRANTED in part** and **DENIED in part**. The Motion is granted as to Count IV, and it is denied in all other respects. An appropriate Order follows.

GEORGETTE CASTNER
United States District Judge

Dated: September 24 2026